**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**JOSHUA THOMAS JACKSON,**<br><br>**Defendant.** | **Civil Action No. 4:25-cv-00733-SDJ-BD** |

**PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AND SUPPORTING MEMORANDUM OF LAW**

The U.S. Securities and Exchange Commission ("Plaintiff" or the "Commission") submits this Motion for Default Judgment against Defendant Joshua Thomas Jackson ("Defendant" or "Jackson") and Supporting Memorandum of Law.

As more fully set forth below, Plaintiff's motion should be granted and the Court should find that Jackson violated Section 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q] ("the Securities Act"), Section 10(b) of the Securities Exchange of 1934 [15 U.S.C. § 78j(b)] ("the Exchange Act") and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and enter a final judgment in the form filed concurrently herewith that:

(1) Enjoins Jackson from future violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, by committing certain acts;

(2) Enjoins Jackson from participating, directly or indirectly, in the issuance, offer, purchase, or sale of any securities, except for trading in Jackson's own personal accounts;

(3) Orders Jackson to pay disgorgement of $2,307,956.43 and prejudgment interest of $781,456.15, offset by the $50,000 Preliminary Order of Forfeiture entered in *United States v. Jackson*, 4:25-cr-189-SDJ-BD (E.D. Tex.); and

(4) Orders Jackson to pay a civil penalty of $2,307,956.43.

## STATEMENT OF FACTS

### A. Overview

Between August 2019 and May 2021, Jackson, acting through three entities he wholly owned or controlled (Passive Wealth Builders, LLC, Rocket Sell, LLC and StreetDivvy Inc.), fraudulently sold approximately $2.7 million in promissory notes to 13 investors. [ECF 1, ¶¶ 1, 25]. Investments ranged from $50,000 to $500,000, and the notes typically provided for the repayment of investor funds within 12 months, with annual interest ranging between 10% and 12%. [*Id.*, ¶ 26]. Jackson told investors that their funds would either be used to purchase and renovate residential properties, specific to each investor, or to fund larger real estate development projects. [*Id.*, ¶¶ 2, 24, 40].

Of the 16 executed promissory notes, Jackson sold 12 notes totaling approximately $2 million to purportedly fund the purchase, renovation and resale of single-family homes. [ECF 1, ¶ 28]. However, Jackson and his companies did not purchase a single house after December 30, 2019, despite raising approximately $1 million from single family home investors from January through August of 2020. [*Id.*, ¶ 44]. Furthermore, when homes were eventually sold, Jackson did not share the proceeds with investors, but kept them for himself. [*Id.*, ¶¶ 33, 51].

Jackson also sold four additional promissory notes totaling approximately $500,000 to purportedly fund larger development projects. [ECF 1, ¶ 34]. Jackson led two other investors, who invested approximately $150,000 in one of Jackson's development project offerings, to believe

they would receive a promissory note, but no note was ever finalized or executed. [*Id.*, ¶ 39]. Jackson drafted all 16 promissory notes and promoted them as investments, the terms of which were generally not negotiated with investors. [*Id.*, ¶ 31].

In addition to promising to return investors' principal, Jackson also promised to pay monthly interest on the promissory notes, pay investors a share of the profits of the relevant project, and secure many investors' funds with a security interest in the real property acquired. [ECF 1, ¶¶ 3, 19]. However, Jackson did not and could not track which investor funds were used to acquire or renovate a particular property, and he fabricated investor returns. [*Id.*, ¶¶ 63, 65]. When investors started asking questions about their specific properties and the status of their investments, he also created an online portal which falsely identified the same property to multiple investors as having been purchased and renovated with their funds. [*Id.*, ¶¶ 64-67].

Jackson only used a small portion of investors' funds as he represented to them. [ECF 1, ¶¶ 4, 42]. Instead, without their knowledge or authorization, Jackson used a large portion of investor funds (i) to renovate properties acquired prior to the relevant time-period, none of which benefitted investors (*id.*, ¶¶ 47, 61); (ii) for his personal benefit -- including purchasing two corporate automobiles, renting two corporate apartments (one of which he lived in for a period of time with his family), personal travel, veterinarian bills, restaurants, hotels, spa visits, groceries, automotive detailing, purchases at Best Buy and Amazon, etc., and by transferring them to his personal checking account (*id.*, ¶¶ 52, 54-55, 59-61, 74, 79, 80) - and other businesses (*id.*, ¶¶ 52, 59, 73); and (iii) to repay other investors (*id.*, ¶¶ 56, 71, 73). Investors collectively lost approximately $2.4 million because of Jackson's misuse of their funds. [*Id.*, ¶¶ 6, 68].

### B. Procedural History

On July 8, 2025, the Commission filed its Complaint in this litigation, alleging that Jackson violated the antifraud provisions of the federal securities laws, specifically Section 17(a) of the Securities Act of 1933, Section 10(b) of the Exchange Act, and Rule 10b-5. [ECF 1]. Jackson was duly served on July 18, 2025. [ECF 3].

Jackson did not file an answer or Rule 12 motion with the Court within 21 days of being served (that is, by August 8, 2025). [ECF 2]. On September 17, 2025, 61 days after he was served, Jackson filed a purported answer with the Court. [ECF 4]. On September 25, 2025, Plaintiff filed a Motion to Strike Jackson's Answer and for Entry of Default (the "Motion to Strike"). [ECF 7]. Jackson did not respond to the Motion to Strike. Jackson also did not comply with the Court's orders or his discovery obligations pursuant to the Federal Rules of Civil Procedure. [ECF 6, 12]. Furthermore, Jackson did not respond to Plaintiff's attempts to communicate with him regarding its pleadings (with one exception, on September 25, 2025) or the Rule 26(f) conference. [ECF 16].

On January 13, 2026, the Court ordered Jackson to amend his purported answer to comply with FRCP 8(b) by January 27, 2026. [ECF 18]. Jackson did not do so. On February 6, 2026, the Court ordered the Clerk of Court to enter a default against Jackson. [ECF 20]. The Clerk did so that day [ECF 21]. The Court then ordered the Commission to move for default judgment. [ECF 22, 24].

### C. The Related Criminal Action

On September 16, 2025, Jackson pled guilty in the Eastern District of Texas to a one-count criminal information that charged him with a violation of 18 U.S.C. § 1957, Engaging in Monetary Transactions in Property from Specified Unlawful Activity (*United States v. Jackson*, 4:25-cr-189-SDJ-BD (E.D. Tex.)).

According to the criminal information, from in or around June 2019 and continuing up to in or around August 2021, Jackson, acting through Passive Wealth, Rocket Sell, Zane Investments Co., and Brite Solutions, Inc., engaged in a "scheme to obtain money and property under the ownership and control of multiple individual [real estate] investors" (which included investors referenced in the Commission's complaint) and "received over $3,000,000 from investors and caused losses to [them] exceeding $2,800,000."

The Court has entered a Preliminary Order of Forfeiture in the criminal case, ordering Jackson to forfeit $50,000. The remaining sentence has yet to be imposed.

## ARGUMENT

### A. The Default Judgment Standard

Default judgments are appropriate when, as here, "the adversary process has been halted because of [an] essentially unresponsive party." *Sun Bank of Ocala v. Pelican Homestead & Savings Ass'n*, 874 F.2d 274, 276 (5th Cir. 1989) (internal quotation omitted). The entry of a default judgment is left to the "sound judicial discretion" of the court. *Mason v. Lister*, 562 F.2d 343, 345 (5th Cir. 1977).

To determine whether a default judgment is warranted, courts perform a three-part analysis. *See, e.g.*, *United States v. 1998 Freightliner VIN # 1FUYCZYB3WP886986*, 548 F. Supp. 2d 381, 383-384 (W.D. Tex. 2008). A court must determine: (1) whether default judgment is procedurally warranted; (2) whether the complaint sufficiently sets forth facts establishing that the plaintiff is entitled to relief; and (3) what form of relief, if any, the plaintiff is entitled to receive. *Id.*; *see also United States v. Bishop*, 2017 WL 1509302, at * 1-2 (N.D. Tex. Apr. 27, 2017).

## B. A Default Judgment is Procedurally Warranted

To determine whether a default judgment is procedurally warranted, courts examine six factors:

> (1) whether material issues of fact are at issue;
> (2) whether there has been substantial prejudice;
> (3) whether grounds for default are clearly established;
> (4) whether default was caused by good faith mistake or excusable neglect;
> (5) the harshness of the default judgment; and
> (6) whether the Court would feel obligated to set aside a default on the defendant's motion.

*Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998); *Joe Hand Promotions, Inc. v. 2 Tacos Bar & Grill, LLC*, 2017 WL 373478, at * 1 (N.D. Tex. Jan. 26, 2017).

The *Lindsey* factors favor granting a default judgment here. First, no material issues of fact exist. The Court should take the facts from the Commission's Complaint as true. *Nishimatsu Construction Co. v. Houston Nat'l. Bank*, 515 F.2d 1200, 1206 (5th Cir. 1973) ("The defendant, by his default, admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established."). As detailed below, these facts conclusively establish Jackson's liability for violating the federal securities laws.

Second, there is no substantial prejudice to Defendant. Jackson was properly served with the Complaint, has made an appearance in the case, and has been served with copies of all of the Court's orders in this matter. Additionally, the Commission has been substantially prejudiced through Defendant's failure to file an appropriate answer despite a Court order. *G&G Closed Circuit Events v. Martinez*, 2026 WL 860483, at * 2 (E.D. Tex. Mar. 9, 2026) (finding substantial prejudice to the plaintiff from defendant's failure to answer or otherwise respond to the complaint), *adopted as modified*, 2026 WL 855158 (E.D. Tex. Mar. 27, 2026).

Third, grounds for default were clearly established by virtue of Jackson's failure to comply with the Court's oral and written order to amend his purported answer to comply with FRCP 8(b) by January 27, 2026. [ECF 18]. Lastly, Jackson is not a minor or incompetent. *See* Declaration of Tiffany B, Kunkle ("Kunkle Decl."), filed concurrently herewith, ¶¶ 3,4). Indeed, in accepting Jackson's guilty plea in the criminal case, the Magistrate Judge found that Jackon was "fully competent and capable of entering an informed plea." *United States v. Jackson*, Case No. 4:25-CR-00189 (E.D. Tex. Sept. 9, 2025), ECF 13 at 1.[1]

Fourth, no evidence exists that Jackson's failure to file an answer was caused by a good faith mistake or excusable neglect. Indeed, the Court specifically addressed its order for Jackson to file a proper answer with him during his appearance at a court proceeding on January 13, 2026.

Fifth, the entry of a default judgment against a defendant who has taken no action to respond is not considered "harsh." *Whitaker v. Farmer*, 2026 WL 477100, at * 2 (S.D. Tex. Feb. 3, 2026); *Joe Hand Promotions, Inc.,* 2017 WL 373478, at * 2. Finally, no evidence exists in the record of any "good cause" to set aside the default if Jackson were to challenge it.

### C. <u>The Complaint Establishes Defendant's Federal Securities Laws Violations</u>

#### 1. The Notes Defendant Sold Are Securities

The first step this Court must take in deciding whether Jackson violated the federal securities laws is to determine whether he offered or sold securities. Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C.

---

[1] Because Jackson has entered an appearance in this litigation, the requirements of 50 U.S.C. § 3931, Protection of Servicemembers against Default Judgments, do not apply. That statute, which requires the plaintiff to file an affidavit stating whether the defendant is in military service as a condition to obtaining a default judgment, only applies to "any civil action or proceeding . . . in which the defendant does not make an appearance . . . ." *Id.*

§ 78c(a)(10)] define "security" to include any "note" or "investment contract." The promissory notes that Jackson sold in this case qualify as either.[2]

*a. The Investments Were "Notes"*

A note is presumed to be a security unless it bears a "family resemblance" to one of the judicially crafted list of instruments that are not securities, or it is determined that it should be added as a new category to the list. *See Reves v. Ernst & Young*, 494 U.S. 56, 65 (1990). Courts examine four factors in determining whether a note bears a family resemblance to instruments that are not securities: (1) the motivation of the parties for entering the transaction; (2) the plan of distribution; (3) the reasonable expectations of the investing public; and (4) the presence of any risk-reducing factors that would make application of the securities laws unnecessary. *Id.* at 66-67. "Failure to satisfy one of the factors is not dispositive; they are considered as a whole." *SEC v. J.T. Wallenbrock & Assoc.*, 313 F.3d 532, 537 (9th Cir. 2002); *see also*, *SEC v. Thomson*, 732 F.3d 1151, 1160 (10th Cir. 2013) (same).

The first factor -- the parties' motivation -- supports finding the notes are securities. Under *Reves*, "[i]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'" *Reves*, 494 U.S. at 66. Here, investors provided funds to Jackson with the expectation they would share in the profits of the

---

[2] Although some of the notes were labelled as "Capital Investor Agreement" or "Capital Investor Operating Agreement" (ECF 1, ¶ 29), those notes nevertheless fall within the ordinary meaning of a promissory note because they provide that the borrowing entity would repay the investor's funds by a specified date. *See U.S. v. Villanueva*, 2016 WL 3390514, at * 3 (N.D. Tex. May 26, 2016) ("A note is '[a] written promise by one party (the *maker*) to pay money to another party (the *payee*) or to bearer.'") (quoting *Note*, Black's Law Dictionary (10th ed. 2014)) (emphasis in original). Consistent with their status as notes, the agreements also generally refer to the relevant business entity as the "Borrower" and the investor as the "Lender," "Holder," and/or "Note Holder," and include references to "this Note" in their text. [ECF 1, ¶ 30].

house sales or real estate developments and receive regular interest payments. [ECF 1, ¶¶ 24, 27]. Moreover, Jackson promoted the notes as investments. [*Id.*, ¶ 31].

The second factor -- the distribution of the notes -- does not preclude finding the notes are securities. While Jackson sold notes to only 13 investors in this case [ECF 1, ¶ 1], this factor is not dispositive. *See Trust Co. of Louisiana v. N.N.P. Inc.*, 104 F.3d 1478, 1489 (5th Cir. 1997) ("A debt instrument may be distributed to but one investor, yet still be a security.").

The third factor -- the reasonable expectations of the investing public -- also supports finding the notes are securities. The Supreme Court has stated that it has "consistently identified the fundamental essence of a 'security' to be its character as an 'investment.'" *Reves*. 494 U.S. at 68 - 69. Here, Jackson's representations to investors would lead a reasonable investor to view the notes as securities. Jackson made representations about expected profits when soliciting investors and referenced "investments" and "investors" in communications with investors. [ECF 1, ¶¶ 27, 31, 40]. And the titles of many of the notes included the phrase "Capital Investor," (*id.,* ¶ 29), further suggesting investors reasonably expected the notes to be securities.

The fourth factor -- risk-reducing factors that would make application of the securities laws unnecessary -- also supports finding the notes are securities. All but two of the notes had no risk-reducing factors, as they do not appear to have been secured by real property (despite language in most notes to the contrary). [ECF 1, ¶¶ 32, 36]. Nor were the notes subject to federal or state regulations (other than securities laws). The fact that two notes (out of 16) were accompanied by a purported security interest in a property (*id.,* ¶¶ 32, 36) does not make application of the securities laws unnecessary because neither security interest provided adequate protection for these investors. It appears that neither security deed was ever filed with the appropriate government authority, and one of the homes was purchased for significantly less than the investor's investment.

(*Id.,* ¶ 33, 38). *See SEC v. Zada*, 787 F.3d 375, 381 (6th Cir. 2015) (fourth *Reves* factor favored finding investments securities where some investments were secured by mortgages on defendant's home as "nothing in the record suggests that the mortgages secured anywhere near the $60 million that he raised"); *Callais Cap. Mgmt., LLC v. Wilhite*, 2021 WL 1216526, at * 7 (E.D. La. Mar. 31, 2021) (fourth *Reves* factor suggested notes secured by personal guarantee and assets of company were securities as they "did little in practice to reduce [investor's] risk at all"); *see also Wright v. Downs*, 1992 WL 168104, at * 3 (6th Cir. July 17, 1992) (holding mortgage notes were securities and noting "Michigan laws concerning the recording of deeds and mortgages are certainly not the type of regulation the Supreme Court had in mind").

*b. The Notes Are Also Investment Contracts*

An investment contract is (1) an investment of money, (2) in a common enterprise, (3) with profits to come solely from the efforts of others. *SEC v. Howey*, 328 U.S. 293, 301 (1946). The investments that Jackson sold in this matter satisfy all three elements.

The first element is satisfied because all investors provided Jackson with money in exchange for profits to be generated from various real estate projects. [ECF 1, ¶ 25].

For the second element, the Fifth Circuit has recognized that "broad vertical commonality" will satisfy the common enterprise requirement. *Living Bens. Asset Mgmt., LLC v. Kestrel Aircraft Co.*, 916 F.3d 528, 536 (5th Cir. 2019). Under the broad vertical commonality test, "the necessary interdependence may be demonstrated by the investors' collective reliance on the promoter's expertise." *Long v. Shulz Cattle Co.*, 881 F.2d 129, 140-41 (5th Cir. 1989). Here, both the single-family home and real estate development investors relied on Jackson's expertise. [ECF 1, ¶ 24, 32]. All of the investors in the single-family homes relied on Jackson's expertise to renovate and resell houses for a profit. [*Id.*]. Similarly, the investors in the larger real estate development

projects relied on Jackson's ability to attract funding for the development projects and Jackson touted his other real estate ventures and companies when soliciting investors. *See SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir. 1974) ("[T]he requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the [sales pitch] meetings and guidelines on recruiting prospects and consummating a sale.").

The third element is satisfied for similar reasons. In evaluating this requirement, courts consider "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Williamson v. Tucker*, 645 F.2d 404, 418 (5th Cir. 1981) (internal quotations omitted). And "[u]nder [the Fifth Circuit's] broad vertical commonality approach, 'the second and third prongs of the *Howey* test may in some cases overlap to a significant degree.'" *Living Bens. Asset Mgmt., LLC*, 916 F.3d at 536 (quoting *Shultz Cattle Co.*, 881 F.2d 129, 141 (5th Cir. 1989)). Investors in the single-family homes were entirely passive and relied on the efforts of Jackson in overseeing and managing the renovations and resale of the homes. [ECF 1, ¶ 32]. Likewise, the real estate development projects all relied on Jackson's efforts to raise money (and failed when he was unable to do so) and the investors had minimal involvement in the development projects themselves. [*Id.*, ¶ 2, 24]. Because all of the investments involved "undeniably significant" efforts by Jackson, the third element is satisfied.

### 2. <u>**Jackson Violated the Antifraud Provisions of the Securities and Exchange Acts**</u>

Exchange Act Section 10(b) and Rule 10b-5 thereunder make it unlawful, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange:

(a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5; *see also* 15 U.S.C. § 78j(b). Violations of Section 17(a) of the Securities Act require a similar showing to violations of Rule 10b-5, except that the fraud must occur "in" the offer or sale of securities and, with regards to Section 17(a)(2), a defendant must obtain money or property by means of an untrue statement or omission of material fact. 15 U.S.C. § 77q(a); *SEC v. Killion*, 2017 WL 7052310, at * 6 n.61 (S.D. Tex. Mar. 24, 2017); *SEC v. Stanford Int'l Bank, Ltd.*, 2013 WL 12360438, at * 2 (N.D. Tex. Apr. 25, 2013). Proof of scienter is required for Exchange Act Rule 10b-5 and Section 17(a)(1) of the Securities Act, but a showing of negligence is sufficient for Sections 17(a)(2) and (3) of the Securities Act. *Aaron v. SEC*, 446 U.S. 680, 691, 697 (1980); *Meadows v. SEC*, 119 F.3d 1219, 1226 n.15 (5th Cir. 1997).[3]

As alleged in the complaint, Defendant violated Section 17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(b) by making material misrepresentations in connection with the offer, purchase and sale of the notes. That is, Jackson falsely told investors that their funds would either be used to purchase and renovate residential properties, specific to each investor, or to fund larger real estate development projects. [ECF 1, ¶¶ 2, 24, 40]. The promissory notes he promoted and provided to investors falsely stated that their investments would

---

[3] The Complaint also alleges that Jackson used aspects of interstate commerce in connection with his fraud. For example, the Complaint alleges that Jackson created an on-line portal to provide investors with specific addresses and other information on their purported investments and anticipated returns. [ECF 1, ¶ 64].

be repaid within 12 months, with annual interest ranging between 10% and 12%. [ECF 1, ¶ 26]. Jackson was the maker of the statements at issue under *Janus Capital Group, Inc. v. First Derivative Traders,* 564 U.S. 135 (2011), because he drafted or approved the promissory notes that contained the misstatements (ECF 1, ¶ 31), and because he personally made the other misrepresentations in direct communications with investors. [*Id.*, ¶¶ 40, 58, 62, 69, 76].

Moreover, Jackson promised to return investors' principal, pay them monthly interest and a share of the profits of the relevant project, and to secure their investments with a security interest in the property acquired. [ECF 1, ¶¶ 3, 19]. None of this was true. Jackson was unable to track which investor funds were used to acquire or renovate a particular property, and he fabricated investor returns. [*Id.*, ¶¶ 63, 65]. Furthermore, when investors asked questions about their specific properties and the status of their investments, he created an online portal which falsely identified the same property to multiple investors as having been purchased and renovated with their funds to deceive them. [*Id.*, ¶¶ 64-67].

Jackson's misrepresentations were material, because they made his investment offerings appear more promising and secure than they were. Jackson acted with scienter (and thus also negligence) as evidenced by, among other things, the online portal he created, the investment returns he fabricated, and the investor funds he misused for himself, his other businesses and other investors. [ECF 1, ¶¶ 1, 4, 42, 52, 54-56, 59-61, 63-66, 71-74, 79-80]. *See SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982) ("dissemination of a known falsehood" establishes scienter). Moreover, Jackson's pattern of multiple misrepresentations indicates that they were intentional, not accidental.

In addition to liability for fraudulent misrepresentations and omissions, Sections 17(a)(1) and (3) of the Securities Act and Exchange Act Rules 10b-5(a) and (c) impose what is commonly

referred to as "scheme liability." Scheme liability exists when a "defendant's conduct or role in an illegitimate transaction has the principal purpose and effect of creating a false appearance of fact in furtherance of a scheme to defraud." *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1050 (9th Cir. 2006), *vacated by Simpson v. Homestore.com, Inc.*, 519 F.3d 1041 (9th Cir. 2008); *see also, SEC v. Farmer*, 2015 WL 5838867, at * 14 (S.D. Tex. Oct. 7, 2015) (same); *Aaron v. SEC*, 446 U.S. at 696 n.13 (defining "scheme" as "[a] plan or program of something to be done; an enterprise; a project; as, a business scheme [or] [a] crafty, unethical project"). Misappropriation of investor funds suffices for scheme liability. *SEC v. Wilson*, 2022 WL 18275941, at * 6 (N.D. Tex. Dec. 28, 2022); *see also*, *SEC v. Kinetic Investment Group*, 2024 WL 4869623, at * 30 (M.D. Fla. Nov. 22, 2024) ("misappropriations of investor funds for [defendant's] personal use serve as a basis for establishing scheme liability."). Here, Jackson violated the scheme liability statutes by misappropriating investor funds for personal expenses and for purposes unrelated to the real estate projects. [ECF 1, ¶¶ 59-61, 71, 79].

### D. <u>The Commission is Entitled to the Requested Relief</u>

In awarding relief, "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). Therefore, the relief prayed for in a plaintiff's complaint limits the relief available for default judgment.

#### 1. Permanent Injunctions

The Commission's complaint seeks two forms of permanent injunctive relief: (a) injunctions from future violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, by committing certain acts (the "obey the law injunctions"); and (b) an injunction prohibiting Jackson from participating, directly or indirectly, in the issuance, offer, purchase, or sale of any securities, except for trading in Jackon's own

personal accounts (the "conduct based injunction"). [ECF 1, Prayer for Relief II and III]. The obey the law injunctions are available pursuant to Securities Act Section 20(b) [15 U.S.C. § 77t(b)] and Exchange Act Sections 21(d)(1) and 21(d)(5) [15 U.S.C. §§ 78u(d)(1), (5)]. The conduct based injunction is available pursuant to Exchange Act Section 21(d)(5).[4]

To obtain the requested permanent injunctions, the Commission must demonstrate that: (1) the Commission has actually succeeded on the merits, (2) irreparable harm will likely result in the absence of the injunctions, (3) the balance of the equities tips in the Commission's favor, and (4) the injunctions are in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008); *see also, Starbucks v. McKinney*, 602 U.S.339, 345 (2024) (noting that "[w]hen Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity," which, with regard to injunctive relief, includes using "the traditional four-part test" set forth in *Winter)*.[5]

Each of the four elements is met here. First, the Commission has succeeded on the merits of its claims. Jackson has defaulted and the allegations in the complaint are taken as true, showing that Jackson defrauded investors of millions of dollars over approximately a two-year period. Jackson's guilty plea in the related criminal action confirms this conclusion.

---

4 Although some courts outside the Fifth Circuit have frowned upon obey the law injunctions for certain antifraud provision of the federal securities law, the Fifth Circuit has recognized the appropriateness of such injunctions. *See, e.g.*, *United States v. Campbell,* 897 F.2d 1317, 1324 (5th Cir.1990) ("A permanent injunction against future violations of a statute is permitted because such merely requires the enjoined party to obey the law."). Nevertheless, to avoid any concerns, the Commission proposes "hybrid" obey the law injunctions that, in addition to reciting the language of the antifraud statutes, also provide additional language that more precisely identifies the prohibited conduct.

5 Courts evaluate the same factors when considering the appropriateness of both an obey the law and conduct based injunction. *See, e.g., SEC v. Silia*, 2022 WL 2346384, at * 3 (E.D. Tex. Jun 28, 2022) (applying traditional injunction factors to decide the appropriateness of a conduct based injunction).

Second, irreparable harm will likely result in the absence of the requested injunctions. District courts granting injunctions under the four-part test have recognized that the government's showing of a likelihood of future violations satisfies the irreparable harm requirement. *See, e.g., SEC v. Haarman,* 2026 WL 562787, at * 2 (W.D. Tex. Feb. 9, 2026) (injunctive relief "is appropriate where defendant's past conduct gives rise to an inference that, in light of present circumstances, there is a reasonable likelihood of future transgressions.") (citation and quotation omitted); *see also*, *FTC v. Silueta Distributors, Inc.*, 1994 WL 387881, at * 1-2 (N.D. Cal. July 11, 1994) (finding the "substantial risk of irreparable harm to the public from defendants' continuing violations of law"). Even courts that previously concluded that irreparable harm was unnecessary in government enforcement actions have alternatively held that demonstrating a likelihood of future violations is sufficient to satisfy the irreparable harm requirement. *See SEC v. Lake Havasu Ests.,* 340 F. Supp. 1318, 1324 (D. Minn. 1972); *see also United States v. Kahen*, 2020 WL 1697974, at * 1 (E.D.N.Y. Jan. 28, 2020); *FTC v. Mortg. Relief Advocs. LLC*, 2014 WL 12479399, at * 1 (C.D. Cal. Aug. 22, 2014).

In determining whether there is a reasonable likelihood of future violations, courts consider the following:

> (1) the egregiousness of the defendant's conduct; (2) the isolated or recurrent nature of the violation; (3) the degree of scienter, (4) the sincerity of the defendant's recognition of his transgression; and (5) the likelihood of the defendant's job providing opportunities for future violations.

*SEC v. Gann*, 565 F.3d 932, 940 (5th Cir. 2009).

Here, Jackson's conduct was egregious and involved a high level of scienter: he knowingly misappropriated significant amounts of investor funds for purposes unrelated to the real estate projects that investors were led to believe their money would be used for. *SEC v. AmeraTex Energy, Inc.*, 2021 WL 1061395, at * 5 (E.D. Tex. Mar. 18, 2021) (misappropriation of investor

funds is egregious conduct that supports injunctive relief). He was singularly responsible for implementing his scheme and routinely deceived and manipulated investors to enrich himself at their expense. Moreover, the conduct was prolonged and deceived multiple investors. Finally, Jackson's failure to respond to the complaint shows that he has not acknowledged the wrongfulness of his conduct. *SEC v. Gordon*, 2021 WL 5086556, at * 9 (N.D. Tex. Nov. 1, 2021) (failure to appear in a case shows lack of remorse).

The remaining two *Winter* factors (balancing the equities and consideration of the public interest) are easily met here. The third factor, balancing the equities, favors the Commission because "investors need[ ] the protection of an injunction" notwithstanding the private interests of the defendant, especially given the likelihood of Jackson's future fraud violations. *SEC v. Manor Nursing Centers, Inc.*, 458 F. 2d 1082, 1102 (2d Cir. 1972).

Finally, as to the fourth factor for an injunction, "[a]s a practical matter, where the Commission demonstrates both actual success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *See SEC v. Chappell*, 107 F.4th 114, 139 (3d Cir. 2024) (quotation omitted). The public interest in enforcing Congress' anti-securities fraud provisions favors enjoining Jackson here.

These factors show that both obey the law and conduct based injunctions are appropriate. *SEC v. VerdeGroup Investment Partners*, 2022 WL 2200409, * 4 (C.D. Cal. Jan. 14, 2022) (finding similar conduct based injunction warranted where "[d]efendants knowingly repeated several distinct and egregious lies to numerous investors over the course of more than a year"). The fact that Jackson is facing sentencing in his criminal case does not undermine this conclusion. *SEC v. Watkins*, 2019 WL 13026037, at * 4 (N.D. Ga. Jul. 5, 2019) (defendant's "criminal conviction and looming sentence do not lessen the need for an injunction").

**2. Disgorgement and Prejudgment Interest**

The Complaint also requests an award of disgorgement and prejudgment interest. [ECF 1, Prayer for Relief IV]. Disgorgement "is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs." *Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 413 (5th Cir. 2007). Disgorgement is "designed to prevent the unjust enrichment of the wrongdoer and to deter others from violating the federal securities laws." *Id.* To establish that disgorgement is warranted, the Commission must "approximate the defendant's 'unjust enrichment' attributable to the securities violation." *SEC v. Hallam*, 42 F.4th 316, 341 (5th Cir. 2022) (citing 15 U.S.C. § 78u(d)(3)). Because disgorgement is equitable in nature, the amount awarded must reflect "the gain made upon any business or investment, when both the receipts and payments are taken into the account." *SEC v. Liu*, 591 U.S. 71, 83 (2020). Once the Commission makes such a demonstration, the defendant may rebut the SEC's requested amount by proving that the amount requested is "unreasonable." *Hallam*, 42 F.4th. at 341.

"[T]he proper starting point for a disgorgement award is the total proceeds received from the sale of the securities." *SEC v. AmeriFirst Funding, Inc.*, 2008 WL 1959843, at * 2 (N.D. Tex. May 5, 2008) (citing *SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d at 1104). Consistent with *Liu,* the disgorgement calculation must then deduct any "legitimate expenses," to derive net profits. *Liu,* 591 U.S. at 91. For purposes of this analysis, "legitimate" means those expenses that "arguably have value independent of fueling a fraudulent scheme." *Id.*, at 92.

Here, the total amount that Jackson raised from investors was $2,652,017.88. Kunkle Decl., ¶ 8. The total amount he returned to them was $208,061.45, *id,* ¶ 9, and his arguably legitimate expenses total $136,000, consisting of expenses for real estate purchases on behalf of

investors and attorneys' fees related to the closing of such purchases. *Id.,* ¶ 10. Thus, Jackson should be ordered to pay disgorgement of $2,307,956.43. *Id.*, ¶ 11.

Like disgorgement, an award of prejudgment interest is intended to prevent the defendant from profiting from his or her illegal conduct. *SEC v. Kahlon,* 2016 WL 5661642, at * 4 (E.D. Tex. Sept. 30, 2016). It prevents the defendant from receiving "what amounts to an interest free loan procured as a result of illegal activity." *SEC v. Myers*, 2018 WL 11353113, at * 7 (E.D. Tex. Jul. 25, 2018). Here, the prejudgment interest amount on $2,307,956.43, calculated from June 1, 2021, through February 28, 2026, using the Internal Revenue service's prevailing rate of interest on tax underpayments, is $781,456.15. Kunkle Decl..¶ 12.

The Commission further recommends that the Court offset the disgorgement and prejudgment interest amount by the $50,000 Preliminary Order of Forfeiture entered in the parallel criminal case, as the criminal case is predicated on substantially the same conduct at issue in this case.

**3. Civil Penalties**

The Complaint also seeks civil penalties. [ECF 1, Prayer for Relief V]. The Securities Act and Exchange Act each authorize courts to impose penalties in civil injunctive actions brought by the Commission, not to exceed the greater of (i) the gross pecuniary gain to a defendant as a result of the violation, or (ii) a specified amount per violation, with the specified amount depending on whether the violation falls in the "first tier," "second tier," or "third tier." *See* 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3)(B). Here, the Commission seeks a civil penalty of $2,307,956.43, representing Jackson's net profits. Such a penalty is permissible as it is less than Jackson's gross pecuniary gain.

Courts consider the following factors when determining whether penalties are appropriate: (1) the seriousness of the offenses; (2) the state of mind; (3) the risk or realization of financial losses created by the conduct; (4) the frequency of the violations; and (5) the defendant's financial condition. *Hallam,* 42 F.4th at 323; *SEC v. Myers,* 2018 WL 11353113, at * 8 (E.D. Tex. Jul. 25, 2018). Here, Jackson's scheme was perpetuated with a high degree of scienter, caused substantial investor harm, and was carried out over a prolonged period. He thus deserves a significant penalty. *SEC v. Evolution Cap. Advisors, LLC*, 2013 WL 5670835, at * 4 (S.D. Tex. Oct. 16, 2013), *aff'd sub nom. SEC v. Valdez*, 661 F. App'x 814 (5th Cir. 2016) ("Without civil penalties, the only financial risk to violators is the forfeiture of their ill-gotten gains.") (citation omitted).

## CONCLUSION

WHEREFORE, the Commission's Motion for Default Judgment should be granted. A proposed Final Judgment has been filed concurrently herewith for the Court's convenience and consideration.

DATED: May 26, 2026.

Respectfully submitted,

*/s/ Robert F. Schroeder*
Robert F. Schroeder
Senior Trial Counsel
Georgia Bar No. 001390
Tel: (404) 942-0688
Email: schroederr@sec.gov

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
Tel: (404) 842-7622
Email: loomism@sec.gov

Rachel Bishop
Staff Attorney
Georgia Bar No. 764613
Tel: (404) 842-5745
Email: BishopRa@sec.gov

COUNSEL FOR PLAINTIFF
U.S. Securities and Exchange Commission
Atlanta Regional Office
950 East Paces Ferry Road, N.E. Suite 900
Atlanta, Georgia 30326-1382

## CERTIFICATE OF SERVICE

Counsel hereby certifies that on May 26, 2026, he electronically filed **Plaintiff's Motion for Default Judgment and Supporting Memorandum of Law** with the Court using the CM/ECF system and served it upon Defendant via email and United Parcel Service, addressed as follows:

Joshua Thomas Jackson
1710 Radisson Street, NW
Palm Bay, FL 32907
Email: jtjackson.4@outlook.com

*/s/ Robert F. Schroeder*
Robert F. Schroeder